NEW-YORK,
May, 1805

Jackson ex dem
Seth Sherwood
v.
Phelix Phelps.

## Jackson ex dem' Seth Sherwood *against* Phelix Phelps.

By the 5th of April. 1803, the title to the military bounty lands vested in the patentees at the time of their deaths respectively, though they died previous to the 27th of *March*. 1788,
  * 2 Vol. *Greenleaf's* Ed. 333.
  † of the 6th *April*, 1790.

EJECTMENT for lands in *Scipio*, in the county of *Onondaga*. *Samuel Mitchel*, the patentee from whom the lessor of the plaintiff derived title. was a soldier in the *New-York* line, who died in *October* 1781, without issue, leaving a brother named *Martin*, and a sister called *Mary*. By the fifth section⁎ of the statute.† " to " carry into effect the concurrent resolutions and acts of the legis- " lature, for granting certain lands promised to be given as bounty " lands, and for other purposes therein mentioned," it was enacted " that the letters patent, directed to be issued, shall issue in the " names of the persons who have actually served in the line of " the army of the *United Staes*, as designated in the concurrent " resolutions, and the eleventh clause of the act passed on the

" 11th day of *May*, 1784, granting the same to such persons " respectively, and to their respective heirs and assigns forever, " and the lands to be granted in and by the said letters patent shall " be deemed, considered, and adjudged to have vested in the re- " spective grantees *and their heirs and assigns respectively*, on the " 27th day of *March*, in the year of our Lord 1783 ; and all " grants, bargains, sales, devises, and other dispositions made by " any of the said grantees, *or their heirs or assigns*, of the said " lands so to be granted to them respectively, or any part thereof, " between the said 27th day of *March*, in the year last aforesaid, " and the date of such letters patent respectively, shall be as good " and effectual, as if the said letters patent had been granted on " the said 27th day of *March* in the year last aforesaid.'

Some short time after the passing of this law, the letters pa- tent for the premises in question were granted to *Samuel Mitchel*. On the 21st of *October*, 1797, *Martin Mitchel*, by deed duly ac- knowledged and recorded, conveyed to *Thomas Pardy*, and he in the same manner, on the 10th of *November*, 1797, conveyed to *Sherwood*.

By an act of the legislature, intituled " An act granting relief to " certain persons claiming titles to lands in the counties of *Cayuga* " and *Onondaga*," it is in the first section ordained, " that *the title* " to all lands *heretofore* granted by letters patent, to officers and " soldiers serving in the line of this state, in the army of the " *United states*, in the late war with *Great Britain*, and *who died* " *previous* to the 27th day of *March*, 1783, shall be, and *is declar-* " *ed to have been vested in the said persons at the times* of their " deaths respectively."

At the trial of the cause, which rested on one single de- mise from the lessor, the antecedent facts, documents, and laws, were given in evidence and relied on by the plaintiff. He also proved the defendant to be in possession of the premises, and that at the time the deed from *Pardy* was executed, it was agreed between the lessor of the plaintiff and *Samuel Phelps* the late husband of the defendant, that *Sherwood* should purchase the premises from *Pardy*, for the benefit of himself the lessor, *Samuel Phelps* and others then in possession of the premises, com- mence an action to try the validity of the title derived from *Samuel Mitchel*, and that, on establishing it, *Phelps*, or his representatives, should receive from *Sherwood* a deed for the premises in question, at 4 dollars per annum. On this testimony the defendant moved

NEW-YORK,
May, 1805
Jackson ex dem
Seth Sherwood
v.
Phelix Phelps.

for a non suit, which being overruled, she then produced a deed, duly recorded and acknowledged, from *William I. Vredenburg* to her late husband, for the very premises, dated the 6th of *December*, 1794. The judge having charged in favor of the plaintiff, the jury found accordingly. A case was then made, subject to the opinion of the court on this point. Whether any title passed by the letters patent to *Samuel Mitchel*, the soldier, he being dead at the time they were issued.

*Woodworth*, attorney general, for the plaintiff. The decision of this case will depend on the acts of 1790, and 1803. It is objected that by the words of the first law, nothing could pass to the soldier who was dead. But if it was meant that only those in existence on the 27th day of *March* should take, the statute would never have directed that the lands should be deemed to have vested, on that day in the " *heirs* " of the patentees. This word is not used merely to denote the quality of the estate, but has a further operation, to vest it in the descendants of those not then in *esse*. Doubts however having been entertained on this subject, the act of the 5th *April* 1803, was passed, which, it is presumed, puts the question at rest.

*Emott*, contra. The expressions relied on, are merely words of limitation. The legal effects of words in a statute, are the same as in a deed, and the terms used in the law referred to, were only to give a fee, not describe the persons who were to take. If a devise be to a man and his heirs, and the devisee die before the testator, the devise is gone, because there is no one to take at the death of the testator, for the heirs cannot come in. The same principle applies in this case. It is an absurdity to say, the legislature intended lands to vest in a man who was antecedently dead. Besides, what rule of descent is to prevail ? In 1782, the common law would govern. In '86 we changed that system, and abolished the rights of primogeniture. In addition to these arguments, the case shews, that at the time when *Pardy's* deed was executed, there was an adverse holding under color of title, and therefore nothing passed by it.

*Woodworth* in reply. The facts and agreement in the case, do away all the argument as to adverse possession, and shew the whole proceedure was to settle the question now brought up, which has never been determined. The 8th section of the act of 1803, prescribes the rules of descent, and establishes those of 1786. We allow, that a devise to a man his heirs, in a deed, will not

operate as a *designatio personæ*, but it may be otherwise, in a stat- ute. Because the one conforms to the law ; the other makes it. By the law of 1803, the title is " *declared*" to have vested in the persons entitled at the times of their deaths. If so, it must de- scend to their heirs.

*Per curiam*, delivered by LIVINGSTON, J. In deciding this cause, it is unnecessary to enquire, whether the legislature, by its resolution of the 27th *March* 1783, intended to comprise within its bounty, as far as regarded the line of this state, persons not em- braced by the act of congress of the 16th *September* 1776 ; or whether the commissioners of the land-office, in carrying its views into effect, have expounded them too liberally, by issuing letters patent to soldiers who were dead at the time of its adoption, or whether, if those who were the authorized agents of government, have erred in judgement, as to the proper object of gratuity, *bonâ fide* purchasers can now be disturbed ? Nor is it of any use to settle the operation of military grants under the act passed the 6th *April* 1790. It cannot be dissembled however, that were it pro- per, in this collateral way, to draw into question the validity of a public grant, and our examination were limited to the terms of the resolution, and the effect of the grants, as fixed by this law, very serious difficulties would occur. Whatever our feelings might be, or however strong the claims on public benevolence, of those, whose fathers may have perished in fighting the battles of their country, we could hardly, without some violence, or indulging an improper sympathy, give to these proceedings, an interpretation as latitudinary, as the commissioners have done. From a view of the different public acts relative to this matter, and a recurrence to the history of the times, we should perhaps, be compelled to say, that a provision was designed for such officers and soldiers only, as were living in *March* 1783.

But whatever doubts may have existed on these points, and on which no opinion is now intended to be given, none can reasonably be entertained, at this day, with respect to the validity of titles de- rived through grants to military men, who may have died at any period whatever during the British war. The legislature has, greatly to its honour declared, by an act passed the 5th *April*, 1803, that the title " to all lands theretofore granted by letters patent, " to " officers and soldiers, serving in the line of this state, in the army of " the United States, in the late war with Great-Britain, and, *who died* " *previous to the 27th March* 1783, should be, and thereby was de-

I

NEW-YORK,
May, 1805.

Jackson ex dem
Seth Sherwood
v.
Phelix Phelps.

" clared to have been vested in the said persons, *at the time of their* " *respective deaths.*" This law was passed with a full knowledge of every circumstance, the same having been brought to public view, by the commissioners apppointed to settle the titles to this property. For, so long since, as the year 1800, these gentlemen, in a very able report to the governor, had exposed the mistakes, if such they were, which had been made in a great many instances, of granting lands to persons who had died during the war, and the inoperative nature of all such patents. They went further; they not only cautioned government against rendering these grants valid, but recommended the institution of an enquiry, as preparatory to a resumption of the lands. Nor were motives of interest wanting, to allure to a measure of this kind ; for, by a schedule accompanying this report, it appeared that, as far as had then come to the knowledge of the commissioners, the state would have gained in this way, near two hundred thousand acres of land in a very valuable part of the country. The legislature however, not forgetful of the services which the patentees had rendered in establishing the independence of their country, disdained, in a moment of tranquility, and when no danger impended, to listen to suggestions of interest, but with a generosity, not very common, and therefore the more laudable in a public body, confirmed all thes epatents without discrimination, and that by expressions so apt and strong, that neither on the argument, nor since, has the plaintiff's title appeared to me, liable to the smalest doubt. The acts being declaratory or not, can be of no moment, as it respects these parties, although from its subject matter, as well as expressions, it would seem more naturally to belong to the former class. As these lands belonged to the state, if the patents were void, or inoperative, (for it is not pretended they have been granted before or since) it was competent to the legislature, to confirm and quiet the titles derived under them, however defective they were before. And as we do not perceive, from the facts before us, that the rights of any person, otherwise acquired, will be affected by the confirmation, we are not bound to suppose that such cases exist. It does not appear that *Vredenburgh*, who conveyed to *Phelps*, had any title at all. If he had, it is not pretended that he, or those under whom he claimed, derived any right from the state.

Something was said of an adverse possession in *Phelps*, at the time of the execution of *Pardy's* deed; but how could this be, when

*Phelps* had agreed, that the purchase should be made, for the express purpose of trying the validity of this title ? Surely stronger evidence cannot be required that *Phelps* did not hold adversely to *Pardy*, notwithstanding his deed from *Vredenburgh*, than his willingness to take under the former, at a stipulated price, so soon as his title should be established. Would it not be monstrous, to let him now set up his own possession in defiance of the plain understanding of both parties, to defeat the recovery of *Sherwood ?*

Nor is it important, whether the act of *April* 1803, passed prior, or subsequent to bringing this suit. Rather than put the plaintiff, who has now a perfect title to a new action, because it be doubtful whether such were the case when this suit was commenced, and for no other purpose than to prevent the defendant's liability to costs, I prefer considering the law as relating back to the time of issuing the patent, which comports also with the intention of the legislature. The *Postea* must be delivered to the plaintiff.

KENT, C. J. Upon this case the two following questions have been made. 1st, Whether there was an adverse possession of the premises, at the time of giving the deed from *Mitchel* to *Pardy*, so as to render the same void. 2d, Whether the original grant from the state to *Mitchel*, was a sufficient basis to support the plaintiff's title.

1—It appears that a deed of the premises was executed by *William I. Vredenburgh* to *Samuel Phelps* on the 6th *December* 1794, and although it is not stated when *Phelps* took possession under that deed, yet we find him in possession on the 10th of *November*, 1797, only a few days subsequent to the deed to *Pardy*. From this, it might be presumed that he was in possession as early, at least, as the time of the sale to *Pardy*, and if so, his possession was under color of title, adverse to that of *Mitchel*. But, notwithstanding this might have been the case, I think that *Phelps* concluded himself from making that objection. When the lessor of the plaintiff purchased from *Pardy* it was with the knowledge and assent of *Phelps*, and he was eventually to be benefited by it, on the terms stated in his agreement. It was agreed between them that the lessor of the plaintiff should purchase, and bring a suit thereupon, to try the validity of the title derived through *Pardy*. This was a waiver of the objection now set up, for the object of the agreement was to try the validity of

NEW-YORK,
May, 1803.

Jackson ex dem
Seth Sherwood
v.
Phelix Phelps.

NEW-YORK, the title, as it had existed in *Mitchel*.   The parties never had in
May, 1805. view this mere technical objection, which does not go to the me-
Jackson ex dem rits of the title.   It would be against good faith, for the tenant,
Seth Sherwood or one under him now to set up, and it it therefore ought not to
v
Phelix Phelps. be permitted.

2—It is stated that the action was commenced in the year
1798, and I am of opinion, that at *that* time the letters patent to
*Mitchel* were nugatory and void, and the property remained vest-
ed in the people of this state.   The act of the 6th of *April* 1790,
gave letters patent for the military bounty lands an operation
from the 27th of *March* 1783, so as to be deemed to have vested
a title in the grantees from that time ; and the legislature were
no doubt competent to give their letters patent a relation back,
to a time anterior to the issuing them.   Considering the promise
that the state had made, to their two regiments of infantry, by the
resolution of the 27th of *March* 1783, this relation back to that
time, was no more than a just execution of that original pro-
mise, and, not being to the prejudice of third persons, it was con-
formable to general principles of law.   18 *Vin. Abr. Tit.*
RELATION, *D. E.*   But this act of 1790, could not, by any just
construction, be considered as authorizing grants, when the per-
son to be designated as the grantee was not alive in *March* 1783.
The resolution of the legislature evidently referred only to officers
and soldiers then *in esse*, and composing the regiments commanded
by *Van Schaick*, and *Van Cortlandt ;* and the resolution of congress
of the 16th of *September* 1796, on which the resolution of the
legislature was framed, only applied to the soldiers who should
continue to the end of the war, and to the representatives of
those who should be slain by the enemy.   There could be no pre-
tence that a soldier who died before 1783, was within those pro-
visions, and the act of 1790, by making the letters patent to be
issued in pursuance of the resolution, to refer back to the date of
the resolution and no further, most undoubtedly meant, that they
should correspond, and be commensurate only with the former
provison.   There is nothing in the words of the act, when at-
tentively considered, that favors a different construction ; and it
would, indeed, have required the most explicit and positive pro-
vision to have extended the grants, by relation, anterior to the
period of 1783, and beyond the limits of the original contract.
The act of the 5th of *April* 1803, appears to reach and help
these patents, made to persons who were dead in 1783, by re-

viving the grant and giving it a relation back to the life of the grantee. It declares " that the title to all lands before granted " by letters patent to officers and soldiers serving in the line " of this state, in the army of the United States, in the war with " Great-Britain, and *who died previous to the 27th of March* 1783, " shall be, and is declared to have been vested in the said per-" sons at the time of their deaths respectively." This act does not appear to have been intended as a declaratory act, and we ought not to presume it to have been so intended, when we do not perceive any solidity in the opinion that such was the antecedent law. And if this last act was a declaratory one, it would not be binding on the courts as such, although as a legislative opinion, it would deserve and receive very respectful consideration. I consider therefore, this act of 1783, as introductory of a new rule in respect to the letters patent in question ; and had it passed before the commencement of the present suit, it would have conclusively established the plaintiff's title. This last provision affects no other rights, than those of the state. There cannot arise any conflicting title in consequence of it, and it rested with the legislature, in its discretion to part with its title to the premises, in the mode, and to the extent it should deem advisable. But a title acquired after the commencement of the suit, cannot be introduced upon the trial, unless it be one derived from the defendant, since this would be to charge the defendant with the costs of the suit. For this reason, I think the plaintiff ought to have been nonsuited at the trial, notwithstanding he appears to be now vested with a valid title.